## Case No. 9,079.

### The MARIA MARTIN.

[2 Biss. 41; [1] 1 Chi. Leg. News, 57.]

Circuit Court, E. D. Wisconsin. Sept. Term, 1868. [2]

COLLISION — PRIMARY CAUSE — NEGLIGENCE—APPROACHING TOO NEAR—LOOKOUT.

1. A propeller ascending the Detroit river discovered the lights of an approaching barque and tug about two miles distant, the night being clear and starlight, but did not change her course until within half a mile of them, and then only enough to pass the tug at a distance of one hundred feet, when the barque suddenly sheered and struck the propeller amid-ships. *Held*, it was bad seamanship in the propeller to put only so short a distance between herself and the tug, and not slacken speed.

2. Though the proximate cause of the collision was the improper handling of the barque, the propeller, having committed faults, cannot go free.

3. It is immaterial that the propeller had not a competent lookout, the captain and mate having seen the lights in good season and needing no information which the lookout could give them. After they saw the lights the responsibility attached to them.

4. A vessel in tow is not excused from keeping close watch, and observing and obeying all signals.

[Appeal from the district court of the United States for the Eastern district of Wisconsin.]

In admiralty. Libel by the Northwestern Transportation Company, as owners of the propeller Cleveland, for damage caused by collision with the barque Maria Martin. [From a decree of the district court dismissing the libel (case unreported), the libelants appeal.]

Spaulding, Dickman and Finches. Lynde & Miller, for libellant.

George B. Hibbard and Emmons & Van. Dyke, for respondent.

DAVIS, Circuit Justice. This case was argued last September with eminent ability, and for want of time to read the evidence

---

was taken under advisement. Owing to my official duties in other circuits and the supreme court, I have been unable to consider it until recently. A very decided impression was made on my mind at the argument, which has been confirmed by an examination of the testimony. The result at which I have arrived is different from that of my learned brother, and I therefore state it with diffidence on account of his superior knowledge and larger experience. As the case will doubtless go to the supreme court, and as other engagements press heavily on me, I have deemed it necessary only to give my conclusions, and shall not therefore analyze the testimony in order to prove their correctness. In all cases of this kind the evidence is conflicting. The rules of navigation being well settled are easily applied to the facts in proof, but the difficulty lies in ascertaining the facts. The propeller Cleveland, owned by the libellants, on her voyage from Ogdensburg to Chicago, during the night of the 22nd June, 1866, while in the Detroit river and near its mouth, collided with the barque Maria Martin, in tow of the tug McClellan on their way down the river and was sunk.

The point to ascertain is, with which party, if either, or both, the fault rests. It is proper to remark, if the night had been dark and there had been difficulty in discovering objects on the water, some excuse would have been afforded for this collision, but as there was a clear starlight, and the signal lights of all the vessels burned brightly, and gave sufficient indications to careful mariners, the accident ought not to have happened. After the propeller entered the river, she steered north by east and headed for the Bois Blanc light, and her officers discovered at the distance of about two miles, the lights of the tug and tow. It is not important to determine whether the propeller blew her whistle after the first or second whistle of the tug was sounded, for that she understood the signal is evident, because she ported her helm at the distance of half a mile from the tug. She swung to starboard about half a point and then steadied, the tug being to the westward of her port bow, and there is no evidence that the barque was not then nearly in range with the tug. After the tug blew her whistle, she also ported half a point and then steadied. She was then heading southwest by south one-half south. The propeller pursued her course until she was abreast of the tug—distant about 100 feet—when her wheel was put hard a-port, and she swung to starboard. This change of course was rendered necessary, as the libellants say, because the barque took a sudden sheer to port, shutting out her red light, and showing only her green light to the propeller, but if so, it availed nothing, for the barque struck the propeller on her port side, as she was swinging to starboard, and she went to the bottom of the river. The libellants do not charge that the tug was in fault, but insist

the propeller was blameless, and that the responsibility for the collision rests wholly with the barque. This position is not well taken. It is clear the collision occurred in a few minutes after the propeller answered the tug's whistle, and that her officers could see, owing to the calmness of the night and the conceded brightness of the lights, that the vessels were in close proximity to each other.

It is equally clear that they knew that the Detroit river, on account of the magnitude of its commerce, and the number of tugs with loaded vessels, passing through it, had to be navigated, to avoid accidents, with great watchfulness and care, and that the tug and barque, whose lights they had made, as they were descending the river, could not be handled, in case of peril, as well as the propeller. Notwithstanding these things, we find these officers managing their boat without regard to the dangers of navigating this river, and exercising no more watchfulness than if they had been navigating the open lake. Although they saw the lights of the tug and barque and pronounced them to be very bright at the distance of two miles, yet they did not change the course of their boat until the tug had signaled them to do it, and at this time the vessels had approached within half a mile of each other. But even then by the practice of reasonable seamanship all trouble could have been avoided. If the propeller, instead of porting half a point, or three-fourths even, had gone a point further to the eastward, the collision could not have taken place. There was nothing in the way of her doing this, for the river was wide enough and there were no lights closing on them from the east. To put only one hundred feet between her and the tug, when she could with safety to herself put a greater distance between them, considering the circumstances of this navigation, was bad seamanship. Watchful and careful officers, having due regard to the rights of persons and property, would not have taken the risk that the officers of the propeller did. They surely risked enough by not changing the course of their boat until she was close on to the tug. Common vigilance required that when they changed the course of the propeller they should have made a more decided change. But these officers, besides not going further to the eastward, were in fault in not checking the speed of their boat. They should not have entered a narrow river, where, in the night, there is always more or less danger of collision, without materially slackening the speed at which they had been running. And this duty was the more incumbent on them, because at so short a distance from the tug and barque they should, as careful seamen, have apprehended the possibility of danger. It will not do to say the propeller performed her whole measure of duty, because she safely passed the tug, and that the proximate cause of the collision was the improper handling of the barque. The

propeller, having committed faults, cannot go free because the barque was also in fault. It is said the propeller had not a competent lookout, but whether she had or had not is immaterial, because this collision was not caused by any omission of duty on her part. The captain and mate of the propeller, standing abaft the capstan. with the lookout near by, in his proper position. at a distance of two miles discovered the lights of the approaching tug and barque, and from this time forward were in command of the ship, and needed no information that the lookout could give them. It would have been a useless thing to point out to them the lights which they saw in good season, and were commenting on as being very brilliant. After they saw the lights, the responsibility attaches to them; and if the ship was afterwards badly managed, the lookout is not to blame for it.

The next question for solution is, whether the responsibility for this collision rests with the propeller alone, or was the barque in such fault that the damages must be divided? It is plain, notwithstanding the faults of the propeller. that this disaster would not have occurred had the barque followed, as she was required to do, the course of the tug. That she did not follow after the tug, but, when the propeller was abreast of the tug, sheered to the port of the tug, shutting out from the propeller her red light, and showing only her green light, and continued on in this course until she struck the propeller on her port side as she was swinging to starboard, are facts clearly established by the weight of the evidence. The current or wind did not cause the sheering, for the barque moved faster than the current. and the wind, being southwest, would not cause her to sheer to port, and the officers of the boat say she steered well. It is said the fault was on the part of the tug, because at the critical moment she altered her course and turned short off to starboard. But the weight of the evidence is against this view of the case. After the tug blew her whistle she ported, as has been before stated, a half point, and then steadied herself back on her course, and was pursuing it when the propeller came abreast of her, and continued in it until after the collision. I agree that it is not easy to reconcile the sheering of the barque with the testimony of those on board of her, but we are more concerned to know that the sheering did occur than to show how it occurred. There have been many theories on this important question presented for consideration, but I have not time to examine them. The conduct of the barque was the result of either mistaking orders or careless management. We have the testimony of the mate that an important signal was mistaken, and it is not at all unlikely that the error in management commenced with this mistake.

It is in proof that the barque through the night did not steer after the tug, and, as she was a good steering vessel, the inference is plain that there was a want of proper observation on the part of those who had her in charge. The approach of the propeller was not regarded by her, because the officers of the deck understood the signal of the tug for casting off line, instead of an approaching vessel. If a vessel is in tow she is not therefore excused from keeping close watch and observing and obeying all signals. The duty of watchfulness was the greater because the river was full of boats, and, light as the night was, there was more necessity for it than if it had been daylight; but this duty does not seem to have been appreciated by the officers of the barque.

When the barque made the sudden sheer to port, the propeller, not being required to anticipate it, did all she could under the circumstances—put her wheel hard a-port.

It follows from what has been said that a decree should be entered dividing the loss, and it is so ordered.

This case was affirmed. on full argument, by the supreme court. 12 Wall. [79 U. S.] 31.

The liability of a steamer, at night, in approaching too near a sailing vessel, when there is room to give her a wide berth, enforced. The Western Metropolis [Case No. 17,440]. See also The Alabama [Id. 122].